Good morning. I'm Lisa Coulter from the Phoenix office of Snow and Wilmer. I'm here today on behalf of Factor Sales. With the Court's permission, I'd like to reserve five minutes for my rebuttal. Your Honors, central to the labor employment system in the United States is the fundamental right of every employer to make core decisions concerning how it wants to operate its business. Do I want to be in business? What businesses do I want to be in? Do I want to stay in those businesses or do I want to go out of business? And when you cut through everything that's in the briefs, that is the central issue that's before you. Indeed, the reason we're here today is the party's dispute over the extent to which the Board is attempting to expand the single employer doctrine to those core decisions and the extent to which the Board is attempting to broaden its ability to enforce restoration remedies. All of this in the context of dealing with a non-union entity. Part of the single employer, but a non-union entity. The dispute is perhaps most clear when you look at the relief that the Board is seeking here today. They're asking this Court to enforce a restoration remedy against Factor Sales. Factor Sales is a company in southern Arizona. It's a family-owned grocery store. They operate a chain of grocery stores, much like you'd go to on the weekends and buy your groceries in any city. They are not unionized. They never have been unionized. What the Board is seeking to do through this restoration order is force Factor Sales to create, form, build, establish, fund, start from scratch a trucking subsidiary to replace its former trucking subsidiary, San Luis Trucking. The Board is seeking this relief even though Factor Sales has not had a trucking subsidiary in over five years. It hasn't been involved in that industry for over five years. All it does is sell groceries. Is the Board limited to that precise remedy, or would it have flexibility after listening to your side in the remedial process to frame a different remedy under the circumstances? I don't believe the Board has the ability to frame a different remedy under those circumstances. The Board has issued the remedy, and the issue before this Court today is whether that remedy is lawful and whether it can be lawfully enforced, and whether the Board's acting outside its own ability and authority. But isn't it inevitable that in the remedial process you have the ability with the Board and they can resolve that the appropriate remedy is a payment to employees or something else other than the specific remedy as drafted and now before us? Your Honor, with due respect, I would disagree with that, and here's why. The Board has issued its remedy, and what you're suggesting is that we go to the conciliation stage and let the Board determine at conciliation stage whether that remedy was appropriate. That is the function of this Court. If that order that was issued by the Board is unlawful, we have the right to have this Court find or consider whether it was unlawful before we get to the conciliation stage. Otherwise, this Court's role is meaningless. Suppose it was lawful, then what? Suppose the order was lawful? Yes. Then we would go to the conciliation stage and work through how to carry the details and the nitty-gritty of how do you carry out an order like this. Why exactly is it unlawful? It's unlawful for any number of reasons. First and foremost, it's completely unprecedented. The Board has cited you to no authority whatsoever in which the Board or any court of this United States has ordered a non-union part of a single employer to basically open from scratch  Why do you say open from scratch? They ordered that SLT go back into business, right? San Luis Trucking, as I was getting ready to note, has not been in business for five years. That's a subsequent event that happened after the Board dealt with this. No, Your Honor, it's not. San Luis Trucking was closed and out of business at the time of the hearing. Right, but I mean they weren't defunct at the time. It was closed and out of business and not operating at the time of the Board's decisions. They hadn't been liquidated yet. They had not been liquidated at that time. Their charter was still in force. No, it had lapsed. It had lapsed. At that time, they had no assets, no customers, no clients, no business. What's happened since then, though, is that it's been liquidated and it's been de-chartered or whatever it's called. It's gone. It's gone. It's off the face of corporate America. At the time, it was still around at the time of the order. I mean, it was, if they, it wasn't. They had no longer had their state charter. They had not paid their annual registration fee. Well, that's easy to fix. Yeah. Assuming they hadn't been liquidated, why couldn't, at the time the order was made, I'm not talking about subsequent events, but at the time the order was made, why couldn't they say, go pay your charter and go back in business? At the time the order was made, the situation was essentially no different than it is today, just further back in time. They had no customers. They had no business. They had no equipment. Well, their customers, their main customer was Factor, wasn't it? No, Your Honor, that's not true. This is a trucking company that hauled goods for independent companies. They had 15, 20 independent customers having nothing to do with Factor Sales. And one by one, each of those companies pulled their business from San Luis Trucking. For whatever reason, they deemed appropriate for their business. Factor Sales remained their main customer. Factor Sales was the last customer to pull out. So by that analogy, Your Honor, if they're the last customer to pull out of the ship, at that point, they were the main customer. They were the only customer left. All of the other customers, for whatever reasons they felt best for their company, made the decision to not do work with San Luis Trucking anymore. Factor Sales made that same decision, but it was the last company to make that decision. Well, let's focus this. Let's assume that the board found and that we approved that the facts are something like the following. There are these union elections. We know what the history is and that Factor is concerned about becoming itself unionization. They want to send a message to the main plant employees. You go with a union, you're going to see what's going to happen. So they deliberately cause SLT to go out of business. They just voted for a union. They lose their jobs. And assuming those are the facts as found by the ALG and the board, which may not be far from it, you would be saying to us, and the board just can't do anything. That's just tough. There is no possible remedy for that. Go away. Is that what you're saying? Absolutely not. That's not what I'm saying. What is it the board should have done as a remedy on the findings that it made, which are close to what I said? First of all, again, with due respect, I would disagree with you on the findings, but the remedy that's available in these types of cases is back pay. We've not contested back pay. If the appropriate – if there is a violation here, back pay is a perfectly appropriate and suitable remedy, and a remedy that's essential to effectuate the remedies under the Act. And that's the test. What needs to be done to effectuate the remedies under the Act? These employees can be made whole through back pay, through complete, full back pay benefits. They can be made whole. Where we're going astray is on the restoration remedy against factor sales. The cases that the board has cited to – and I want to make sure this point – I'm clear on this point. The cases that the board has cited to are cases where a union entity has been caught unlawfully subcontracting work. They send the work out the door, continue to supervise it, continue to monitor it. They've just removed the employees from the situation. They've subcontracted it out, and they're required now to bring it back in. Those cases that the board cites are unremarkable. There's hundreds of cases like that, and they're appropriate. That's not what happened here. San Luis Trucking never subcontracted out work. San Luis customers, independent customers, pulled all of their work one by one from San Luis Trucking. Factor sales was the last company to do that, and it pulled its work from San Luis Trucking. Why? Because, as we've laid out in the briefs, it reorganized its business. Before this decision was made, it purchased its groceries from its competitor, Bashes, and had San Luis Trucking call them in. Factor sales made the decision that buying from its competitor probably wasn't a smart idea, and it started a relationship with Unified, where it could buy groceries from Unified, become a member of a co-op, shift its risk and legal responsibility for those groceries, have those groceries hauled in by Unified, have Unified accept responsibility for palleting, and basically alter, through a comprehensive approach, the way it manages its business. This was not a case where San Luis Trucking subcontracted out its work. San Luis Trucking had no control over these decisions. This was a decision by factor sales as to what was best in factor sales' own business, and it pulled the work. And that's where the reliance on the single employer doctrine stops, and that's where no court, no court has found under such a set of facts, or any facts, that a non-union member of a single employer can be held accountable for reforming or restoring a union entity that is closed and out of business. And I see I'm at five minutes and eight seconds, so I'm going to reserve the balance of this for my rebuttal. Thank you. Thanks, Ms. Coulter. Good morning, Your Honors. Greg Lauro for the National Labor Relations Board. Your Honors, as we state in our brief, the restoration order that the Board issued here is not unprecedented. In fact, it's quite common. It's the presumptively valid remedy for the serious violations that we've been discussing this morning, and for good reason, it restores employees to the position they would have occupied absent these serious violations. And so I wanted to first address this idea that it's completely unprecedented, but more to the point, it's the Board's view that the Court's discussion of the bankruptcy and dissolution and changed circumstances since the time of the Board's order and since the time of the hearing's closure is premature, and that in any event, even if the Court were to address those facts now, they do not automatically show that the bankruptcy and dissolution themselves render the restoration remedy automatically unlawful. There simply are too many undetermined facts that the Board would need to address at a compliance hearing, and the Court should allow that administrative process to be continued. Suppose it's true. I mean, I realize you're saying this is not the forum for that, but suppose you have a compliance hearing, and it turns out the company, SLT, is defunct. What happens then? The Board would consider that at the compliance hearing, and among the unresolved issues the Board would consider at that time is, number one, what about factor? We have a single employer finding. Factor is jointly and severally liable for the remedy, of course, and at least as far as the record at the close of the hearing shows, factor is a viable ongoing operation with nine stores, 500 employees, and the question becomes, would it be an undue burden for factor to effectuate the remedy? Where the record shows, it was factor and its owners that started SLT in the first place. Factor had given SLT interest-free undocumented loans to finance its operations, including to buy a couple trucks, and so it begs the question, how do we know, as the company argues, that factor could not restart SLT just as it had done before or buy trucks just as it had done before? Are there other remedies available, too, if that one doesn't apply? There are other remedies such as back pay, but the Board would have to determine whether that would be sufficient under the circumstances. Is there forward pay as well? Is that available? I mean, the back would depend, and the Board still has to determine this, how long the back pay period would go. What I'm saying is, in addition to making them hold for the pay they've lost, can they say, since the company is not going to go back in business, we can't put it back in business, they're entitled to some additional forward pay? I'm not aware of the Board's authority to grant such a remedy in addition to back pay, and I want to be careful. It may just be semantics that I haven't heard the term forward pay, so I don't want to make such a broad statement. That's because I just made it up. Oh, okay. I'm just asking if that's a possibility. It's not a possibility that I'm aware of in Board precedent, but frankly, that could just be me not knowing about it. And even as to back pay, the Board needs to determine, of course, specific amounts at compliance, and I don't know if counsel is warranted that they have no plans to challenge back pay in writing, regardless of whether the restoration remedy goes away and SLT is defunct. But we're using the term back pay here. Do we mean the essentially breach of contract, and that is payment of the wages you would have earned under the existing employment with SLT to the date of hearing, less what you earned to the date of hearing? Is that the concept of back pay? And we often use the word front pay, meaning, and you'll get paid for another year, et cetera. That is the basic concept, Your Honor. It's the wages you would have earned absent the unfair labor practices, but the back pay period, that is how far does it run. To the date of decision, to today, not to some prior date, you're saying. If the Board is giving a back pay remedy, it would be to the date of the compliance order they then issue sometime in the future. Is that what you're saying? The Board would have to determine the period, but it could be ongoing in some cases until the employer takes certain corrective action, is all I mean that the back pay period would need to be determined. So it could include an element of forward pay or front pay. That is pay for a period after the Board's decision. After the Board's decision in the merits proceeding, yes. The back pay period would need to be determined, yes. And as we were discussing, Your Honor, because I appreciate your questions, we just don't have facts on the record showing that this remedy is invalid as a matter of law right now. As I was saying, there are too many unanswered questions about whether it would be an undue burden for Factor to do this, including the fact that as of the record on the close of the hearing, Factor was still in the shipping business. It just had this other company, Unified, shipping the same goods on the same route. And as the Board noted, Factor at that time was not bound by a written contract to continue doing so. You alluded to irregular loans to Unified? Not to Unified, sir, that I know of. There were loans, and I'm sorry, I didn't mean to jump in and correct you, but there were loans from Factor to SLT, its wholly owned subsidiary, that were interest-free and undocumented. And the record shows that that included, I believe, $60,000 for the purchase of trucks. The point being that this wasn't an arm's-length relationship. The company had a practice of providing SLT with funds interest-free. And so in sum, you know, the Board's position is that this remedy should be enforced at this stage, and it remains for the Board to determine the details of the remedy at compliance. For example, at this point, we do not even know if, considering these changed circumstances, the Board might modify the remedy, or if it does not, how many trucks, if any, Factor will be required to rent or buy or make available for the resumed operations. Would you argue that we could look at the NLRB findings as including something to the effect that Factor allowed or encouraged or wanted SLT to lose its customers because it wanted to accomplish this anti-union objective? I think it's fair to say that the Board looked at this as part of an overall plan, yes, Your Honor, of combating unionization. At first, you unlawfully subcontract the bulk of San Luis Trucking or SLT's work, and then when it's starved of work, you close it because it's allegedly unprofitable. Now, of course, the financial statements relied upon to show that SLT was hemorrhaging money were discredited as unreliable, and the company's own accountant took a step back from those documents because substantially all of what he would need to make an opinion someone else could rely on were omitted. So in sum, we ask the Court to enforce the Board's order, and unless Your Honors have further questions, I thank the Court for its time. Thank you, Mr. Dorff. Ms. Kulterer, back to you. Thank you. As a preliminary matter, I stood up here before you and told you that the relief being sought by the Board was unprecedented. Counsel stood up here and told you that it was not unprecedented. Yet, counsel did not give you one precedent in his oral argument, and there's not one precedent set forth in the brief. The only precedent, for want of a better word, that's relied on in the brief is the Gold Coast case, which I would beg the Court to read because it stands for the proposition. Gold Coast ordered restoration only to the extent that a company still existed and was still operating, and that's not the case we have here. So I would urge the Court to go back through the briefs and look for one single precedent. Where does that take us? I'm sorry. Does it mean that if your client does what we've been alluding to here, deliberately closed it down, and succeeds in getting it out of business before the NLRB is finished, then this relief is denied because of that? I'm just wondering, there's a certain arrogance to that, that I've already destroyed the company to show those union guys what they'll get if they try and unionize the main plant. I'm not following how that helps you here. I appreciate that, Your Honor, but the arrogance, with all due respect, is not the issue. There are a number of remedies that are applicable in any given situation. Okay. Restoration is not a remedy that's available in this case. And even if this was a case where a restoration remedy is available, the courts have rejected it. And, in fact, this Court itself rejected it in cases like R&H Masonry and G&T Terminal, saying that it's not an appropriate remedy because it's not necessary to effectuate the remedies under the Act. The different factors the courts have looked at, there's three general factors. One, the amount of time that the company's been out of business. Here, the time of the board's decision was a couple of years. Now we're over five years. The courts rely on that because they assume that in the interim there's been a loss of patronage, a loss of loyalty, a loss of goodwill. The standard for a restoration remedy is whether it is unduly burdensome. And that expense, to that degree, the second category that the courts look at is capital expense. And that's a factor that this Court focused on in R&H Masonry. And it held that, the Ninth Circuit held that where capital expense outlay is simply too great, it's too harsh of a remedy, and it's not necessary, again, here's the key, to effectuate the remedies under the Act. The employees have a remedy. They can be made whole with back pay. Here we're talking about starting a company from scratch. Is there evidence of what that would cost? Was that litigated at all? There was evidence as to what would be involved, not dollars and cents cost. There was evidence about the fact that there were no longer trucks. There was no longer insurance. So there's no financial evidence regarding the capital expense? Of the outlay, no, there was not. It was simply done in the context of what would have to be done to get there. No, that's kind of vague. There was no specific evidence about what financial burden it would be. Not in dollars and cents. Oh, that's what we're talking about, right? We're talking about capital expense. Right. But at the hearing, there was evidence in terms of what would be involved in doing that. It was not reduced to a dollar and cents. Well, I mean, again, if you just sort of, you'd have to buy some trucks, that doesn't really tell you very much. How could anybody determine that that's overly burdensome? This is far more than buying trucks. This is starting a business from scratch. What exactly did you prove? There were trucks. There's insurance. There's licensing. There's advertising. And how much all that would be is a question mark. Right. We did not go through that from a financial standpoint, Your Honor. How can you fault the board then? Well, one of the reasons that was not gone through in dollars and cents is because the remedy being sought by the board is unprecedented. The board has never done this. And no court in the United States has ever directed this. That's not an area that there would be any notice to go to because, again, counsel's not cited you to a single case where a non-union part of a single employer has been directed to fulfill a restoration order by building a company up from scratch. I just want to make sure I've got this straight. Sure. So I don't have any misunderstanding here. Before the board, they're arguing for restoration. The ALJ ordered restoration. It goes to the board. They're pushing for restoration, right? Right. And then when it's your turn, you don't come back and say, gee, it would cost us a billion dollars to do this. You just say we'd have to buy trucks and insurance and things like that. Oh, no, let me make sure. There was no push for restoration at the hearing. Restoration is something the ALJ came up with in his order. Right. And then you go to the board. And then we went to the board, correct. Now, at no point did you come back and say, gee, it's going to cost us X amount of dollars to do this. Not at that point, no. You say we'd have to buy trucks, we'd have to do all these other things. Or, if I may add, or compare it to what you're paying to Unified, which presumably is bearing the cost of a business plus justifiably making a profit. And if I may answer Your Honor's question, I know that I'm out of time. Your Honor, you're comparing apples and oranges. This was not, let me phrase it this way. If Factor Sales had wanted to starve off the union, it simply would have subcontracted out that work and hired another trucking company to come in and haul the groceries from Bashes to San Luis to Factor Sales. What Factor Sales did was reorganize its business. And there's, the evidence is all in the record. They shifted the way they managed their inventory. They shifted who they bought from. They shifted the products they sell and put on their benches. This was not a substituting one trucking company for another. This was a complete reorganization. If they subcontracted work, they would have done the classic, the classic violation. The classic. Subcontracting union work to a nonunion shop. The classic violation is exactly that, where you take First National Maintenance as an example, where you take the maintenance function and you have another company perform it. But everything else remains the same. Here, that was not the case. This was a comprehensive reorganization of Factor Sales business that involved a lot of everything else, with who hauling the groceries being one part of it, and with that being wrapped into the company that was supplying the groceries and having them haul the groceries in. To reorganize your business like that and remove that one portion of it was not in Factor Sales' best interest and didn't make any sense from Factor Sales. So this is not your classic subcontracting situation, like First National Maintenance, and that's the reason why a restoration order is unprecedented in this case. I know I'm out of time. Unless the panel has any questions, I appreciate your time. Ms. Coulter, thank you. Ms. Bloor, thank you as well. The case just argued is submitted. We note for the record that Wynn v. Astruz was vacated pending the result of mediation. Anything else? We'll stand and recess for the morning. Thank you. Thank you.
judges: Garbis, Alarcon, Silverman